BIRD WILSON, WILLIAM NICHOLS and JOHN ADLUM, administrators of JAMES WILSON, Esq., for the use of GEORGE HARRISON *against* WILLIAM LEWIS, REES MOORE, RICHARD LEWIS and MATTHEW BROOK, junior.

Where one is bound to do an act, or pay money at a day certain, though after the day the election of the obligor is gone at law, yet in a hard case equity it seems would relieve.

DEBT 12,226*l.* 10*s.* Plea payment, with leave to give the special matter in evidence.

The obligation was dated on the 31st October 1796, conditioned for the payment of 3074*l.* 2*s.*6*d* . on the 31st October 1797,

and 3074*l.* 2*s.* 6*d.* on the 31st October 1798, without interest, in cash, or the bonds and notes of James Wilson, due on the said days respectively; accompanied with a warrant of attorney to enter up judgment.

Two receipts were indorsed thereon, the first for 481*l.* 10*s.* on the 13th November 1797, and the second for 1463*l.* 2*s.* 9*d.* on the 27th December following; which it was admitted, were paid by notes of Mr. Wilson. On the 27th February 1798, the bond was informally assigned to Harrison in trust, and on the 7th March following, judgment was entered up, and a *fieri facias* issued to the then next term. On application to the Court of Common Pleas, the proceedings were stayed, and the cause was put at issue. Two notes of the intestate, due before the 31st October 1797, surmounting the balance due on the first instalment, were tendered to the plaintiff's attorney on the 7th April following, and the excess was required to be credited on the second instalment; but the same were refused, and the notes were lodged in the prothonotary's office.

It appeared, that the bond was given in payment of several tracts of land at Birdsborough, sold by Mark Bird, esq., the agent and brother-in-law of Mr. Wilson, at public vendue on the 2d May 1796, and that the conditions of the sale were as follow: That "one third of the purchase money should be paid on the delivery of the title deeds, one third in one year, and the remainder in two years thereafter; that all bonds or notes of the owner, due at the time of any payment, should be taken by him as cash; that the tenant's part of the crops should be reserved to them; and that the owner should make a title clear of all incumbrances, and give up possession on receiving the first payment."

At the time of the sale, Mr. Wilson's bonds and notes had fallen into discredit, and had sunk in value, to ten shillings in the pound, and were sold publicly at that rate. His lands accordingly on an average, sold near one third higher than their supposed real value in specie, on account of his paper being receivable in payment.

Six mortgages of the premises and other tracts, of different dates, remained on record, though they appeared on examination to have been satisfied, except the one third part of a family mortgage; concerning which likewise, there were strong presumptions of payment.

In May 1795, John Lewis Bard obtained a lease and possession of the Birdsborough estate from the intestate for eleven years; but nineteen days before the sale, he covenanted to release and surrender all his interest therein, upon his receiving all moneys due

to him from his landlord upon settlement, and being allowed to hold Hopewell Forge and lands for one year, rent free. The money due to Bard, not being paid by Wilson, the former refused to deliver up the possession of the demised premises, and in September 1796, proceedings were instituted against him under the landlord and tenant act, when he obtained a verdict and judgment to continue in possession, until his demand should be satisfied. He accordinly received the landlord's part of the crops, valued at 171*l*.

On the trial, the defendants insisted, that they should be allowed to settle the balance due on the first instalment of the bond, by the two notes which had been tendered, agreeably to the conditions of sale; and although they did not press for an immediate credit for the value of the crops, yet they urged their loss thereof, as a failure of performance on the part of the intestate which would dispense with the strict legal operation of the obligation.

The plaintiff's counsel contended, that the defendants had solemnly engaged to pay the first instalment on the 31st October 1797, and not in April 1798, and that a punctual performance was of the utmost moment to a person who sold real property to relieve himself from embarrassments.

The recept of the two sums in November and December 1797, by the intestate· was mere matter of condescension in him, but he was not bound to stretch his indulgence further, and much less was his assignee so bound.

It is perfectly notorious throughout all the counties in the state, that many incumbrances continue unsatisfied on record, after being fully paid off; such were the present mortgages, which never could affect a purchaser.

A vendor of lands, though he warrants the title and covenants to save the vendee harmless, is not responsible for the unlawful acts of strangers. Here Bard agreed to surrender up his lease and posses sion; his subsequent refusal ought not to prejudice the plaintiffs. At the utmost, defendants can only be entitled to be allowed the value of the crops.

The great question is whether the defendants can insist on the delivery of the notes, after the day of judgment. On this point, the law is clear and express, that where one is bound to do a certain act, or pay a sum of money on or before a particular day, the obligor has the election before the day of payment; but after the day and no tender made, his election is gone and the obligee may demand which he pleases. And so is the current of all the cases. Co. Lit. 90. *b*, 145. *a*. 2 Co. 36, 37. 5 Vin. 217, pl. 13. Bro. Dette, pl.

159. Gilb. Law Evid. 188.  1 Powel contra.  408, 409.  1 Rol. Abr. 726.  2 Rol. Abr. 519.

The court, in their charge to the jury, said, that though it was highly probable, the whole of the mortgage moneys had been paid off before the sale in 1796, yet as the purchasers were to receive a title clear of all incumbrances, on their making the first payment, under the conditions of sale, they were not bound to hunt up proofs, or to make their other payments, until satisfaction was regularly entered.   As to the crops in the ground, Bard cannot be considered as a stranger, but as holding under Mr. Wilson.   The release of his tenancy did not take effect until the sum due to him was discharged, and he was accordingly continued in possession by a court competent to the determination of the fact.   Both these circumstances, therefore, will, on legal principles, operate to excuse the defendants from not delivering the notes, or paying the money on the precise day stipulated, as the first breach of contract took place on the part of the vendor.   And if we recur to the conditions of sale, it is expressly declared, that " all bonds or notes of the owner, due at the time of any "payment, shall be taken by him as cash," however the condition of the obligation may be penned.

But admit for a moment, that neither of those circumstances had existed, and that *stricto jure* the election of the obligors ceased after the day of payment, would not a court of equity have granted relief against the rigor of the law, in a case of such clear hardship? We are inclined to think a chancellor would deem himself bound to interpose.   Here the lands were publicly sold on the terms of receiving the owner's bonds or notes as cash ; that species of paper credit was then bought at a discount of 50 per cent in the market, and the lands were generally sold for one-third beyond their real value, merely on that ground.   The depreciation of the intestate' sbonds and notes arose either from his fault or misfortune, and did not depend on matters of a public nature ; if they had appreciated to par, the buyers must have sustained the loss on the speculating contract.   Why should they not profit by a different event when the risk has been run?   We know of no similar book cases, and must therefore be guided by the reason and justice of the transaction, and the evident intention of the parties.   In the authorities cited by the plaintiff's counsel, the alternatives of the contract bear some equality towards each other in point of value ; but suppose a case of great and striking inequality, as that A on the purchase of an article of small value, is bound to pay to B 100 pepper corns, 100 bushels

of wheat, or 500*l.* at a day certain, and the pepper corns or wheat have not been tendered at the day, would not equity prevent the exaction of the 500*l.* and mitigate the severity of the law, as a hard bargain which ought not in good conscience to be executed? The common sense of mankind will afford a ready answer.

Verdict for defendants, and 10*l.* 13*s.* 6*d.* certified to be due to them from the plaintiffs.

Messrs. Hopkins and Evans, *pro quer.*
Messrs. Read and Biddle, *pro def.*